**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: K.O.C., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: J.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1080 EDA 2024 |

Appeal from the Decree Entered February 12, 2024
In the Court of Common Pleas of Northampton County Orphans' Court at
No(s):  A2023-0044

| | | |
|---|---|---|
| IN RE: V.C.C., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: J.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1082 EDA 2024 |

Appeal from the Decree Entered February 12, 2024
In the Court of Common Pleas of Northampton County Orphans' Court at
No(s):  A2023-0045

| | | |
|---|---|---|
| IN RE: H.S.C., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: J.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1084 EDA 2024 |

Appeal from the Decree Entered February 12, 2024
In the Court of Common Pleas of Northampton County Orphans' Court at
No(s):  A2023-0046

| | | |
|---|---|---|
| IN RE: I.A.C., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |

J-S27015-24

|  |  |  |
|---|---|---|
| APPEAL OF: J.C. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1086 EDA 2024 |

Appeal from the Decree Entered February 12, 2024
In the Court of Common Pleas of Northampton County Orphans' Court at
No(s): A2023-0047

|  |  |  |
|---|---|---|
| IN RE: L.S.C., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: J.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1088 EDA 2024 |

Appeal from the Decree Entered February 12, 2024
In the Court of Common Pleas of Northampton County Orphans' Court at
No(s): A2023-0048

|  |  |  |
|---|---|---|
| IN RE: N.C.C., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: J.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1090 EDA 2024 |

Appeal from the Decree Entered February 12, 2024
In the Court of Common Pleas of Northampton County Orphans' Court at
No(s): A2024-0002

BEFORE:   LAZARUS, P.J., NICHOLS, J., and COLINS, J.*

_____

* Retired Senior Judge assigned to the Superior Court.

- 2 -

MEMORANDUM BY LAZARUS, P.J.: **FILED NOVEMBER 19, 2024**

J.C. (Mother) appeals from the decrees, entered in the Court of Common Pleas of Northampton County, involuntarily terminating her parental rights to her six minor children, K.O.C. (born 6/2020), V.C.C. (born 6/2019), H.S.C. (born 5/2018), N.C.C. (born 7/2015), I.A.C. (born 7/2014), and L.S.C. (born 6/2013).[1] After careful review, we affirm on the basis of the trial court opinion authored by the Honorable Jennifer R. Sletvold.[2]

Mother and C.C. (Father)[3] (collectively, Parents) are the parents of 13 children. The instant matter concerns Parents' six youngest children (collectively, Children). Prior to placement, all 13 children, the family's two dogs, and Mother and Father lived in a one-bathroom Section VIII row home

_____

[1] On May 7, 2024, our Court *sua sponte* consolidated the six separate appeals at Nos. 1080 EDA 2024, 1082 EDA 2024, 1084 EDA 2024, 1086 EDA 2024, 1088 EDA 2024, and 1090 EDA 2024. **See** Pa.R.A.P. 513.

[2] This case is now back to this Court after having been remanded for the preparation of a Pa.R.A.P. 1925(a)(2)(ii) opinion. **See In re: K.O.C., V.C.C., H.S.C., I.A.C., L.S.C., & N.C.C.**, 2024 PA Super 231 (Pa. Super. filed Oct. 1, 2024). On remand, the trial court also entered an order correcting an error in the transcript. Specifically, the order notes that on page 266 of the notes of testimony for the hearing held on February 12, 2024, "the original transcript inadvertently identified the [c]ourt as speaking on lines four through eight[,] when[,] in fact[,] it was the [g]uardian *ad* [*l*]*item*, Leonard Mellon, Esquire." Order, 10/21/24 (italics added). Accordingly, the court amended the transcript to accurately reflect the correct testimony.

[3] Father's parental rights were also involuntarily terminated with regard to Children. In July 2024, our Court affirmed those termination decrees. **See In Re: K.O.C., et al.**, 1079, 1081, 1083, 1085, 1087 & 1089 EDA 2024 (Pa. Super. filed July 29, 2024) (unpublished memorandum decision).

- 3 -

in Bethlehem. The family had no income and lived solely off of government benefits.

On October 27, 2021, the Northampton County Department of Human Services, Children, Youth and Families Division (CYS) received a Child Protective Services (CPS) referral that Children's half-brother, D.G., had been sexually abusing several of his younger siblings. N.T. Termination Hearing (Vol. I), 2/12/24, at 65-66. CYS caseworker, Heather Major, who investigates child abuse allegations, visited Mother's home to discuss a safety plan with the family. *Id.* at 69-70. Mother told Major that she did not believe the sexual abuse allegations lodged against D.G. were true.[4] *Id.* at 91. In forensic interviews, several of the Children disclosed to Major[5] that D.G. had been sexually abusing them. *Id.* at 95-97.[6] Major testified that "there [also] were concerns for the condition of the home." *Id.* at 71. Major stated that Mother's home was the worst home that she had ever seen in her professional capacity, describing it as "deplorable [and] unfit for a child or anybody to properly reside

_____

[4] Mother allegedly installed cameras in the home, but the cameras apparently did not show any inappropriate sexual behavior occurring in the house. Mother also claimed to have put locks on the outside of her daughters' bedroom doors at night to prevent anyone from entering.

[5] Detective Emily Falko from Bethlehem City Police Department also conducted a forensic interview of one of the Children regarding the allegations of sexual abuse inflicted upon her by D.G. *Id.* at 95-97.

[6] Major testified that one of the older children Facebook messaged Mother several times telling her about the sexual assaults, but Mother told her "you can do what you want when you are 18. [D.G.] is not going anywhere. . . . [G]o clean your room." *Id.* at 107.

in." *Id.* at 89. Major testified that the younger children in the home were "dirty, . . . smelled[,] . . . [and] looked like they needed to take a bath." *Id.* at 93. *See also id.* at 165-66 (CYS caseworker testifying younger Children had dirty fingernails, were wearing "very soiled" clothing, had "soiled diapers" and some had "lice infestations").

As a result of Parents' lack of ability to control Children or implement protective capacities, as well as the appalling state of the family home,[7] CYS assumed legal and physical custody of Children on October 28, 2021, via emergency protective orders. Children were subsequently placed into foster care homes, together, in groups of two or three. *Id.* at 98. Children were adjudicated dependent on November 8, 2021. A permanency plan was established for Mother that consisted of participation in, and successful completion of, a mental health evaluation and follow-through with all evaluator recommendations, completion of a comprehensive parental capacity evaluation, and maintenance of stable housing and income for at least six months. It was also determined that visitation would resume when recommended by Children's treatment team. At the time of the termination hearing, none of Children's therapists recommended Children's reunification with Mother either soon or immediately thereafter. *Id.* at 191.

_____

[7] On October 29, 2021, the family home was condemned and Mother lost her Section VIII housing voucher.

In early November 2021, Mother was charged, arrested, and taken into custody—all due to her failure to act following several of the Children telling her about D.G.'s sexual abuse. *Id.* at 100-04.[8] Mother's bail conditions did not permit visitation with Children.[9] Mother ultimately posted a surety bond and was released from jail in November 2023, at which time she moved in with maternal grandfather.

In January 2022, Alyssa Lindahl, Psy.D., performed a comprehensive mental health evaluation on Mother. Doctor Lindahl prepared a report indicating that Mother did not believe her daughters' allegations that D.G. sexually abused them and their siblings, noted that Mother described one of her daughters as "vindictive and hypersexual," called another daughter "mean and a troublemaker," and referred to another daughter as a "liar." *Id.* at 37-38, 42. Mother told Dr. Lindahl that she had been diagnosed with post-traumatic stress disorder (PTSD), anxiety, depression, and a hoarding disorder and that she did not believe she could ever overcome her hoarding behaviors. *Id.* at 39-41. Doctor Lindahl also concluded that Mother had a

---

[8] D.G. admitted to sexually abusing nine of his siblings and was ultimately arrested and charged with various crimes. On November 30, 2022, D.G. pled guilty to seven counts of indecent assault on a person less than 13 years of age.

[9] On March 17, 2023, Mother entered a plea of *nolo contendere* to the charge of intimidating a witness and endangering the welfare of children. She received an aggregate sentence of 8 months and 29 days to 23 months and 28 days, followed by a 2-year probationary tail. Mother was not permitted to have visitation for the first year following Children's removal from the family home.

borderline I.Q. and that her personality testing "suggested some schizoid personality traits with avoidant and paranoid features." *Id.* at 44.

Doctor Lindahl ultimately determined that Mother did not adequately protect Children from sexual abuse after she had been notified of it. *Id.* at 43. The doctor recommended Mother participate in a protective parenting program, an intensive outpatient program for supportive therapy, be administered psychotropic medications, and receive individual therapy for her psychiatric conditions. *Id.* at 44-45. Finally, Dr. Lindahl recommended that Mother not have unsupervised contact with Children until deemed appropriate by CYS. *Id.* at 46.

On July 13, 2023, CYS filed petitions to involuntarily terminate Mother's parental rights to Children pursuant to 23 Pa.C.S.A. §§ 2511(a)(1), (2), (5), (8), and (b) of the Adoption Act.[10] On February 12, 2024, the court held a termination hearing[11] where CYS caseworkers Shakira Roseway, Major, and Jennifer Lorah, forensic psychologist and evaluator Dr. Lindahl, Mother, and Father testified.[12] On February 12, 2024, the court entered six separate

---

[10] 23 Pa.C.S.A. §§ 2101-2938.

[11] At the hearing, the court marked and admitted the Juvenile Court record, for each of the six Children's dependency matters, into the instant record. N.T. Termination Hearing (Vol. 2), 2/12/24, at 159-60.

[12] Children's guardian *ad litem*, Leonard M. Mellon, Esquire, also joined in CYS' brief for purposes of appeal. Because counsel expressed that it may create a conflict of interest for him to represent two of Mother's other children who are not parties to this appeal, E.J.C. and Z.C., the court appointed Brian Lawser, *(Footnote Continued Next Page)*

decrees involuntarily terminating Mother's parental rights to each child pursuant to 23 Pa.C.S.A. §§ 2511(a)(1), (2), (5), (8), and (b). On March 11, 2024, Mother contemporaneously filed six timely notices of appeal[13] and a Rule 1925(b) concise statement of errors complained of on appeal. *See* Pa.R.A.P. 1925(a)(2)(i).

On appeal, Mother presents the following issues for our consideration:

(1) Did the trial court err in finding that [Mother] had failed to fulfill her parental duties, or to work toward fulfillment of her parental duties through engagement with and satisfaction of the goals of her permanency plan for a period in excess of six (6) months?

(2) Did the trial court err in finding that [Mother] had been rendered incapable of parenting and had refused to parent and failed to satisfy the requirements of her permanency plan, leaving [C]hildren without the benefit of parental care and has failed to provide for their physical and mental well-being?

(3) Did the trial court err in finding that [Mother] was not prepared to assume her parental role?

_____

Esquire, to represent E.J.C.'s and Z.C.'s legal interests. *See* 23 Pa.C.S.A. § 2313(a); *see also In re Adoption of L.B.M.*, 161 A.3d 172 (Pa. 2017) (where court finds guardian *ad litem* cannot adequately represent legal interests of child, counsel must be appointed).

[13] Mother has filed six separate notices of appeal in compliance with *Commonwealth v. Walker*, 185 A.3d 969, 977 (Pa. 2018), which held that "[I]n future cases [Pa.R.A.P.] 341(a) will, in accordance with its Official Note, require that when a single order resolves issues arising on more than one lower court docket, separate notices of appeal must be filed. The failure to do so will result in quashal of the appeal." *See also In re M.P.*, 2019 PA Super 55 (Pa. Super. filed February 22, 2019) (applying *Walker* holding in termination of parental rights/goal change appeal).

(4)     Did the trial court err in finding that severing the parent-child relationship would not destroy an existing, necessary[,] and beneficial relationship?

(5)     Did the trial court err in finding that termination of [Mother's] parental rights would best serve the needs and welfare of [C]hildren?

(6)     Did the trial court err in finding that termination of [Mother's] parental rights is in the best interests of [C]hildren?

Appellant's Brief, at 6.

When we review a trial court's decision to grant or deny a petition to involuntarily terminate parental rights, we must accept the findings of fact and credibility determinations of the trial court if the record supports them. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id.* (citation omitted). "Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand." *In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009) (citation omitted). We may not reverse merely because the record could support a different result. *T.S.M.*, 71 A.3d at 267. Additionally, we give great deference to the trial courts. *Id.* Moreover, "[t]he trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citation omitted).

> In a proceeding to terminate parental rights involuntarily, the burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so. The standard of clear and convincing evidence is defined

- 9 -

as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." It is well established that a court must examine the individual circumstances of each and every case and consider all explanations offered by the parent to determine if the evidence[,] in light of the totality of the circumstances[,] clearly warrants termination.

*In re Adoption of S.M.*, 816 A.2d 1117, 1122 (Pa. Super. 2003) (citation omitted). *See also In re C.P.*, 901 A.2d 516, 520 (Pa. Super. 2006) (party seeking termination of parental rights bears burden of proving by clear and convincing evidence that at least one of eight grounds for termination under 23 Pa.C.S. § 2511(a) exists and that termination promotes emotional needs and welfare of child set forth in 23 Pa.C.S. § 2511(b)).

Mother argues that CYS filed to meet its burden of proof under subsection 2511(a)(2) where

> [Mother] remedied the conditions and causes [that] led to [C]hildren to be without essential parental care, control[,] or sustenance necessary for their physical or mental well-being. [Mother] has diligently pursued housing for [C]hildren, participated in all training, classes[,] and programs which she believed would hasten the arrival of the hope for reunification with [C]hildren. [Mother] has complied with every service and treatment recommended by [CYS]. These actions are all in direct contrast to the requirements for a termination of parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2).

Appellant's Brief, at 19.

In order to terminate parental rights under subsection 2511(a)(2), CYS must prove by clear and convincing evidence that:

> [R]epeated and continued incapacity, abuse, neglect[,] or refusal of the parent has caused the child to be without essential parental care, control[,] or subsistence necessary for his physical or mental

- 10 -

> well-being and the conditions and causes of the incapacity, abuse, neglect[,] or refusal cannot or will not be remedied by the parent.

23 Pa.C.S.A. § 2511(a)(2). Section 2511(a)(2) "emphasizes the child's present and future need for essential parental care, control or subsistence necessary for his physical or mental well-being," especially "where disruption of the family has already occurred and there is no reasonable prospect for reuniting it." *In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2010) (citation and emphasis omitted).

While Mother claims she has "done everything within [her] capacit[y] to comply with the requirements and recommendations of [CYS]," she also readily acknowledges that she "fail[ed] to maintain either a stable income or stable housing." N.T. Termination Hearing (Vol. 1), 2/12/24, at 12. Instantly, Mother acknowledges that she is "uniquely unqualified and has been and continues to be disabled[14] with respect to complying with [CYS'] requirement of maintaining a stable and legitimate income. Nevertheless, [Mother] has testified to a hope and desire to one day join the workforce and find compliance with this aspect of the Agency's requirements." *Id.* at 11.

At the time of the termination hearing, Children had been removed from Mother's care for over one year and eight months. As of October 2023, Mother had complied with her plan objectives, including protective parenting education. N.T. Termination Hearing (Vol. 2), 2/12/24, at 149-50, 191; *id.*

---

[14] CYS caseworker Jennifer Lorah testified that Mother told her she had a note from her doctor saying that she cannot work; however, Lorah had not yet seen the note. *Id.* (Vol. 2), at 189-90.

at 200 (CYS caseworker testifying Mother "participated in pretty much any service that she was able to" in prison, was "actively working with Lehigh Valley Families Together" when she was released from jail, and attends visits). CYS' main concern about Mother was more her "lack of progress, not necessarily compliance." **Id.** at 200.

Although Mother requested a housing list from a CYS caseworker and told CYS that she had been looking for housing in Monroe County through the Lehigh Valley Families Together program, she had not yet been successful as of the time of the termination hearing. Mother was living with Father in a one-and-one-half-bathroom apartment rented by paternal grandmother. Lorah testified that things still needed to be done to the house "in order to make it a return resource for [C]hildren," that she had not received a copy of the lease for the property from the landlord, and that she did not know who was legally permitted to live in the home. N.T. Termination Hearing (Vol. 2), 2/12/24, at 185-89; **see id.** at 205 (as of date of termination hearing, Mother had not provided CYS with verification that landlord or City of Bethlehem would allow 11 children and four adults to live in paternal grandmother's apartment). Moreover, at the time of the termination hearing, Mother had been denied receiving social security supplemental income or social security disability benefits, although she indicated that she had appealed those decisions. **Id.** at 201.

Based upon Mother's persistent inability to find suitable housing or earn a steady income, it is reasonable to conclude that Children's present and

future needs for "subsistence necessary for [their] physical or mental well-being" are not and will not be remedied. N.T. Termination Hearing (Vol. 2), 2/12/24, at 141-42 (CYS caseworker testifying was not aware of Mother having access to any mode of transportation, employment, or any proof of suitable housing for family if reunified with Children); *id.* at 157 (as of date of termination hearing, CYS had "no realistic expectation of [Parents obtaining] housing" and they had reported no income). Moreover, the fact that Mother's visits with Children have never progressed beyond unsupervised speaks volumes regarding her capacity to parent appropriately. *See id.* at 135-136 (CYS caseworker testifying during supervised visits Mother would have inappropriate conversations giving inaccurate information to Children, requiring redirection); *id.* at 153-54 CYS (caseworker testifying during visits Parents told Children to be disruptive in foster homes and that they did not have to listen to foster parents); *id.* at 154-55, 179 (CYS caseworker testifying foster parents reported Children's behaviors regressed following parental visits); *id.* at 179 (Mother telling Children when she is released from prison they were all going to be living together again as a family).

Finally, Mother's vow that she "hopes and desire[s] to one day" be able to find gainful employment so that she can provide financially for Children is untimely. *See In re Z.P.*, 994 A.2d at 1126 (where child had been in foster care for first two years of his life, termination under § 2511(a)(2) proper because "his need for permanency should not be suspended where there is little rational prospect of timely reunification"); *see also In re Adoption of*

***R.J.S****.*, 901 A.2d 502, 513 (Pa. Super. 2006) ("The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future."). Here, none of Children's therapists or service providers recommended that Children be reunified with Parents anytime soon. N.T. Termination Hearing (Vol. 2), 2/12/24, at 191. Mother, in fact, testified that if reunification were to occur, that she would not be capable of taking all of the Children back at once. ***Id.*** at 250. Mother, herself, testified that due to her mental health issues — obsessive compulsive disorder, hoarding disorder, anxiety and depression— as well as irritable bowel syndrome, she is incapable of working. N.T. Termination Hearing (Vol. 2.), 2/12/24, at 227-28. Moreover, her only plan to provide for Children financially was her suggestion that Father "get a job and [donate his] plasma." ***Id.*** at 231.

Thus, we find that termination was proper under subsection 2511(a)(2). ***See In re S.C.***, 247 A.3d 1097, 1104 (Pa. Super. 2021) (citation omitted) ("The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties.").

We are mindful that, under subsection 2511(b), "[t]he rights of a parent shall not be terminated solely on the basis of environmental factors such as

**inadequate housing**,[15] furnishings, **income**, clothing and medical care if found to be beyond the control of the parent." 23 Pa.C.S.A. § 2511(b) (emphasis added). However, here the trial court found that the "developmental, physical, and emotional needs and welfare of Child[ren] would not be met with Mother [and] that it was in Child[ren's] best interest[s] that [the] parental rights of Mother be terminated." Trial Court Opinion, 10/22/24, at 34. Children expressed their wishes to be adopted by their respective foster families who were adoptive resources. *See* N.T. Termination Hearing (Vol. 2), 2/12/24, at 162-73. The trial court's determination that Mother's behavior has exposed Children to horrendous traumatic events, not the least of which included failure to stop or protect the Children from sexual abuse by a sibling and also caused Children to be exposed to deplorable living conditions, is supported by the record. Additionally, the court found that Mother's failure to address her own co-dependency issues, inability to form healthy relationships with Children, and failure to set appropriate boundaries with Children support termination under subsection 2511(b). We agree.

After a careful review of the record, the briefs on appeal, and relevant case law, we conclude that the terminating Mother's parental rights was

_____

[15] Mother testified that Father is on a waiting list for Section 8 housing in Northampton, Lehigh, Carbon and Schuylkill Counties. *Id.* at 232-33.

proper under subsections 2511(a)(2)[16] and (b).  We rely upon Judge Sletvold's

comprehensive 35-page trial court opinion in affirming the trial court's

decrees.  We direct the parties to attach a copy of that opinion in the event of

further proceedings in the matter.

Decrees affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 11/19/2024

---

[16] An appellate court need only agree with the trial court's decision as to any one subsection of section 2511(a), as well as 2511(b), to affirm the termination of parental rights.  *In re K.Z.S.*, 946 A.2d 753, 758 (Pa. Super. 2002).

IN THE COURT OF COMMON PLEAS OF NORTHAMPTON COUNTY
COMMONWEALTH OF PENNSYLVANIA
ORPHANS' COURT DIVISION

| | | |
|---|---|---|
| IN RE: N.C.C., | : | NO.  OC-2024-0002 |
| | : | |
| A Minor Child | : | No. 1090 EDA 2024 |
| | : | |
| | : | **Involuntary Termination** |
| | : | **of Parental Rights** |

## <u>OPINION PURSUANT TO PA.R.A.P. 1925 (a)</u>

We submit this Opinion pursuant to Pa.R.A.P. 1925 (a)(2)(ii) following remand by the

Superior Court. This matter was originally before the Court on the Petitions of the Northampton

County Department of Human Services, Children, Youth and Families Division ("CYS" or "the

Agency") for Involuntary Termination of Parental Rights of J      L    G       ("Mother") and

C     L    G    y, III ("Father") in regard to six minor children: K.O.C., a female child, d.o.b.

6/ /20; V.C.C., a female child, d.o.b. 6/ /19;  H.S.C. a female child, d.o.b. 5/  18; I.A.C. a

female child, d.o.b. 7/  /14; L.S.C. a female child, d.o.b. 6/ '13; and N.C.C., a male child, d.o.b.

7/   15, (collectively "the Children" or "Children"). The Petitions for Involuntary Termination

of Parental Rights were filed pursuant to Sections 2511 and 2512 of the Adoption Act, 23

Pa.C.S.A. §§ 2511, 2512, and for a goal change from "return to parent" to "adoption." The

Petitions were filed on July 13, 2023. A non-jury trial was held on these Petitions before the

undersigned on February 12, 2024, after which, we entered six separate decrees involuntarily

terminating the parental rights of both parents. [1] Mother appealed the final decrees. For the

---

[1] The Petitions for Involuntary Termination of Parental Rights with respect to two additional children born to
Mother and Father, E.J.C., and Z.K.-E.C., remained pending after the February 12, 2024 non-jury trial due to the
ages of those two Children and the need for additional proceedings in which those two Children could be
represented by their own counsel. N.T. 2/12/24 Vol. 1 at pp. 10-16.

1

reasons that follow, we respectfully assert that the termination of parental rights of Mother concerning N.C.C. "the Child" should be affirmed for the reasons stated herein.

## Facts

The following are the facts as we find them following receipt of the evidence at the non-jury trial on February 12, 2024: Mother, who was forty-three (43) years old at the time of the non-jury trial, is the mother of a total of fifteen (15) children, four of whom have reached the age of majority. [2] Father is the biological father of Mother's thirteen (13) youngest children. Although Mother was unmarried at the time of birth of all fifteen (15) of her children, she and Father have been together as a couple for almost twenty-one (21) years. They married approximately two (2) years ago. Notes of Testimony ("N.T.") 2/12/24 Vol II at p. 215.

Mother was represented during the course of the dependency and at trial on February 12, 2024 by Drummond Taylor, Esquire. Both Mother and Father appeared with their counsel and testified at the Non-Jury Trial on February 12, 2024. N.T. 2/12/24 Vol. II at pp. 214-264. The Guardian ad Litem for Children was Leonard Mellon, Esquire.

In addition to Mother and Father's testimony, the testimony of the following individuals was received on February 12, 2024: 1.) Jennifer Lorah, who worked for the Agency in various capacities since June 19, 2006 and was currently a Caseworker II in the permanency area, N.T. 2/12/24 Vol. II at pp. 162-219; 2.) Heather Major, who had been employed in various capacities with the Agency since April of 2012 and was a Caseworker III in the child protective services unit during October of 2021, N.T. 2/12/24 Vol. I at pp. 64-116; 3.) Shakira Roseway, who had

_____

[2] The Agency did not file petitions to terminate parental rights with respect to five of Mother and Father's other children based upon their ages: C.L.C. born in May 2005, R.C., born in May 2006, S.C., born in April 2007, T.C., born in December 2008, and J.C., born in December 2009.

been employed by the Agency as a Caseworker II in the ongoing unit for two years, N.T. 2/12/24 Vol. II at pp. 127-160; and 4.) Alyssa Lindahl, Psy. D., of PA Forensic Associates, who performed a Comprehensive Mental Health evaluation on Mother.[3] N.T. 2/12/24 Vol. I at pp. 22-64.

Following a house fire in 2017 at their previous residence in Lehigh County, Pennsylvania, the family (Mother, Father, their thirteen minor children, and Mother's adult son D█ █ G█ █ y) began living at 7██ Broadway, Bethlehem, PA 18015. N.T. 2/12/24 Vol. II at pp. 215. Mother had Section VIII housing for 16 years leading up to 2021, when she lost her Section VIII voucher. *Id.* at pp. 222-223. The Agency became involved with the C█ █ family due to a GPS referral in October 2020.[4] *Id.* at 215. The Agency issued a service to assist the family in order to remediate the home conditions at the 714 Broadway address. *Id.* That assistance included obtaining additional beds for the Children. *Id.* at pp. 213-217.

In the summer of 2021, Jennifer Lorah, the on-call Agency caseworker at the time, had contact with the C█ █ family in connection with a GPS report. *Id.* at pp. 162-165. At that time, her job was to assess the safety of the Children on that day. She went to the home at 7██ Broadway and met with Mother and one of the older Children on the porch. *Id.* Jennifer Lorah did not enter or tour the home at that time. As more fully discussed below, during the summer of 2021, some of the older female Children, including Child at issue herein, reported to Mother and Father multiple instances of sexual abuse at the hands of their older half-brother, D█ █ G█ █.

---

[3] Ms. Lorah presented additional testimony at the April 24, 2024 non-jury trial.

[4] It had been explained during the testimony in this matter that a general protective services or "GPS" is a report received by an Agency, which is, for example, a report of general neglect, truancy, or other general conditions regarding a child and/or a child's minor behavioral issues. Conversely, a child protective services or "CPS" report is an allegation of physical abuse or neglect that rises to the level of abuse, such as sexual abuse, physical abuse, medical neglect, or dental neglect.

Initially, Mother did not believe the allegations. Nonetheless, Mother and Father responded by sending the six oldest girls to stay with Father's mother for a period of time while Mother investigated these reports. N.T. 2/12/24 Vol. 1 at pp. 69-70. After the girls were sent away, Father installed security cameras, rearranged the rooms, and put locks on the outside of the girls' bedroom door. The cameras were functional and recording, and Father reviewed the footage daily. Father testified that he saw nothing concerning to him on the cameras.

Mother did not contact law enforcement about the girls' allegations, but she did her own investigation. N.T. 2/12/24 Vol. 1 at pp. 245-247. Mother put locks on the doors to keep D. away from the other kids as a precaution. *Id.* Mother also put cameras up in the house. *Id.* Mother testified that she believed the girls were lying until she learned later that D. confessed to sexually abusing his siblings. *Id.* In autumn of 2021, the six oldest female Children had returned to the address at 7 . Broadway.

On October 27, 2021, the Agency received a CPS referral regarding the thirteen (13) minor C Children, with D. G. as the alleged perpetrator. N.T. 2/12/24 Vol. I at pp. 65-90. After receiving the CPS referral, Heather Major, acting in the capacity of child abuse investigator, contacted the Bethlehem City Police and the GPS caseworkers and proceeded to the home at 7 roadway. *Id.* At the time Ms. Major arrived at the home on October 27, 2021, all of the C , Children, except for one of the older Children, were present in the home. *Id.* Ms. Major testified that on October 27, 2021, she observed that the younger Children were all very dirty, and they smelled and looked like they needed to take a bath. *Id.* Ms. Major observed that the one Child, who was almost fourteen (14) years old at the time, had not changed her pants in several days. *Id.* Based upon her observations, Ms. Major had concerns regarding dental neglect

4

for some of the Children. *Id.* More than one of the younger Children were infested with lice. *Id.* at pp. 90-94.

That evening, Mother and Father permitted Ms. Major and the police, accompanied by Father, into the multistory row home to tour the first floor of the home. *Id.* at pp. 70-71. The home was very cluttered, and covered in absolute filth and squalor. *Id.* Ms. Major described it as one of the most deplorable homes she has ever seen. *Id.* As Ms. Major toured the home, her shoes stuck to the grime on the floor, and the odors were unbearable throughout. *Id.* The first floor of the home consisted of a kitchen, an unused but littered living room, a dining room, and a front room devoted to hoarded baby items. *Id.* at pp. 69-78. The basement, which was where the Children washed their clothes had recently been flooded, and there was an excessive amount of mold and mushrooms growing out of the basement floor. *Id.* One of the rooms upstairs consisted of a room that was filled, floor to ceiling, with baby items, including clothing, car carrier seats, and "Pack 'N Plays." *Id.* Most of the items in the hoarded rooms were never used. *Id.* Some of the items were organized in bins, bags, and garbage bags while some of the items were just thrown around. *Id.* Father described the room, which was unable to be used for anything else, as Mother's "hoarding room" and "her thing." *Id.* Mother and Father's bedroom was on the second floor, which is where the three youngest Children slept in used Pack 'N Plays with holes in them. *Id.*

The second floor contained a bedroom where four (4) male Children slept and the bedroom where the six older female Children slept. *Id.* The girls' bedroom contained two large dog cages that were coated in filth. *Id.* The girls slept on shared mattresses on the floor, and while there were some blankets on the floor, there were no pillows or sheets. *Id.* The only bathroom, which everyone used and which was filthy, was also on the second floor. *Id.*

5

D   1 G   's bedroom was in the attic. *Id.* Another room in the attic had become another devoted hoarding room. *Id.* There were many flies in the home, including live ones flying around. *Id.* Additionally, the home had sticky fly traps everywhere that were covered in dead flies. *Id.* The kitchen had rotting food everywhere, dirty dishes in the sink, two sticky fly traps covered in dead flies, a bin filled with about six inches of yellow fluid that smelled like urine and there was an overwhelming bug infestation. The kitchen also had a broken window pane. *Id.* Father reported that the bin with the yellow fluid contained a leak from the bathtub above; however, Ms. Major believed it was coming from the toilet upstairs. *Id.* The room identified as the living room had items all over the floor, additional bins and clothing, as well as racks filled with cleaners and other items. *Id.* The room was dirty and had a very strong odor. *Id.*

Although the home had working utilities, the room identified as the dining room did not have a working light and contained a refrigerator that did not work. *Id.* There were at least two dogs in the home, as well as what appeared to be animal waste on the floor of one room. *Id.*

On October 27, 2021, Heather Major spoke to Mother concerning the sexual abuse allegations, and Mother did not believe that the allegations were true. *Id.* at pp. 90-94. On October 27, 2021, Heather Major spoke with Father about the sexual allegations. *Id.* Father responded that he had heard something, but he did not fully know or understand anything. *Id.* Mother and Father agreed to a Safety Plan for twenty-four (24) hours, whereby Mother left the home for the night with the three youngest Children, Dɛ  ft the home and went to a separate location, and Father stayed at the 7¹ Broadway address with the other Children. *Id.* pp. 68-72, 90-94. Ms. Major and the police believed the sexual abuse allegations to be viable, and Ms. Major had concerns about the condition of the home and whether Father would be able to handle the remaining Children at the home. *Id.*

On the evening of October 27, 2021, with the permission of Mother and Father, Ms. Major and Detective Emily Falko of the Bethlehem City Police took two of the older female Children, T.C. and S.C., to the Bethlehem Police Department for forensic interviews. *Id.* at pp. 95-97, 105-107. The Children emitted a foul odor that came from the home. During the forensic interview, T.C. made various disclosures of sexual abuse that she had witnessed and undergone at the hands of D<span></span>. *Id.* Among other things, D<span></span> would make one of his half-siblings suck his nipples and touch what she referred to as his "nasty pee." *Id.* She reported that D<span></span> would have her lick and suck his "nasty pee", that his "pee" was hard at the time, and that he would ejaculate in her mouth. *Id.*

One of the children who was not the subject of termination of parental rights pending before the Court, S.C., showed Ms. Major and the police Facebook messages by which she notified Mother several times about the sexual abuse. *Id.* Mother's reported response to S.C. was essentially: "you can do what you want when you are eighteen (18), D<span></span> not going anywhere." *Id.* Another child, who was not the subject of termination of parental rights pending before the Court, T.C., shared with Ms. Major and the police text messages by which she notified Father of the sexual abuse. *Id.* Father's response to T.C. was essentially, "[T]his is a C<span></span> problem and the C<span></span> will take care of it." *Id.* As a result of the forensic interviews of S.C. and T.C. on October 27, 2021, the Agency staffed the case the following day. *Id.*

When the Agency workers returned to remove the Children on October 28, 2021, the police went upstairs in the home, and, pursuant to a search warrant, took multiple photographs of the home depicting its condition. Fourteen of those photographs were marked and admitted as Exhibit "Agency-3." *Id.* at pp. 77-90. Ms. Major testified with respect to the photos. Ms. Major testified that the photographs accurately depicted the conditions as she observed them on

7

October 27, 2021 and as the Children described them to her. *Id.* Ms. Major testified that the photograph depicting the "hoarding room" looked as though someone neatened it up a bit between her tour of the home on October 27, 2021 and the time the photograph was taken and the Children were removed on October 28, 2021. *Id.*

Ms. Major testified that the photograph depicting Mother and Father's bedroom, where the 3 youngest children also slept, showed a bed with what had been a white sheet. *Id.* The sheet had not been washed in quite some time and appeared totally brown. *Id.* The two Pack 'N Plays contained several holes. *Id.* There were also food items, baby items, and children's shoes strewn about. Ms. Major testified regarding the photo depicting the bathroom, which had not been cleaned in some time. *Id.* She explained that it was littered with rotting food, and fly traps full of dead bugs dangled from the mold-covered ceilings. *Id.* Ms. Major testified as to the photo depicting the room in which four of the male Children slept on bunk beds and stated that the police found a bottle of alcohol in that room. *Id.* Ms. Major stated that the boys' bedroom was very cluttered, but not as badly as some of the other areas. *Id.* Ms. Major testified regarding the photo depicting the room in which all of the girls, except for the three youngest, slept on mattresses on the floor. *Id.* She explained that the mattresses were ripped and stained and stated that there were far too many children sleeping in that room. *Id.* There was not one mattress per child. *Id.* There were also two filthy cages in that room for dogs, which the girls were responsible for caring for. *Id.* There was also a shattered window in that room. *Id.* Ms. Major testified regarding a photo depicting the small area in the attic that had been the eldest daughter's room but was now a second hoard room for Mother. *Id.* Ms. Major stated that that area was the cleanest in the home. *Id.* Ms. Major testified that the home was deplorable, unfit to be a residence for a child or for anyone. *Id.* at pp. and also at pp. 77, 89, 111.

8

Ms. Major testified that of all of the CPS investigations in which she has been involved, she found the conditions at the 7: Broadway address to be the worst she has seen. *Id.* Never before has Ms. Major needed to discard articles of her own clothing because she could not get the odor out of her clothes. *Id.* She never before saw mushrooms growing out of the floor. *Id.* She testified that even the dogs' living conditions were very poor, given the filth, the dirt, and the food conditions. *Id.* She found it to be insurmountable. *Id.*

On October 28, 2021, the Agency sought and obtained Emergency Orders for Protective Custody due to Parents' lack of protective capacities, lack of ability to control or govern their Children, and the deplorable state of the home. *Id.* at pp. 97-100. The undersigned entered the Orders removing the thirteen (13) minor Children from the 7 ... Broadway home and transferring physical and legal custody of the Children to the Agency. The Agency was unable to keep all thirteen (13) Children together, but most of the Children were placed into traditional foster care homes in groups of two or three. K.O.C., V.C.C., and H.S.C. were placed together. I.A.C. and L.S.C. were placed together. N.C.C. was placed with Z.K.-E.C.

Caseworker Jennifer Lorah testified that she had very little contact with the C&... family between the date she presented as an on-call worker and the date of the Children's removal. N.T. 2/12/24 Vol. II at pp. 160-165. Ms. Lorah was the on-call supervisor on the day of removal and was at the Agency when the Children were brought in before being sent to their respective foster homes. *Id.* She met with all of the Children on that day. *Id.* Ms. Lorah's goal on October 28, 2021 was to get the Children settled with necessary belongings that would go with them to their foster care homes and to calm them down from an upsetting situation. *Id.* Ms. Lorah stated that the youngest three Children arrived in soiled clothing and diapers with very matted hair and lice infestations. *Id.* and also pp. 166-168. Some of the clothing on the older girls were ill-fitted

9

and needed to be washed. *Id.* Ms. Lorah explained that the Children were very bonded to each other and were more upset by being separated from one another than from leaving home. *Id.*

On October 29, 2021, the City of Bethlehem Code Enforcement condemned the residence at 7  Broadway. On October 29, 2021, following a hearing, Shelter Care Orders were entered maintaining the Children's respective placements in various traditional foster care homes.

On October 29, 2021, at Ms. Major's request, D   came to the Bethlehem City Police Department to be interviewed Ms. Major was present for and observed the interview of D    N.T. 2/12/24 Vol. I at p. 99. During that interview, D  admitted to sexually abusing nine of his siblings, including Child at issue herein. *Id.* Ms. Major had the opportunity to speak to the Children, who reported having been sexually abused and that they observed their siblings being sexually abused by D  . *Id.* at pp. 96, 105-107. The statement of one of the Children, L.S.C., stood out to Ms. Major, in which L.S.C. described that all of the girls were in the room, and she was on a mattress pretending to sleep when D  came down. *Id.* She continued that D  would generally come down to the room and take one of the girls up to his room, and, on this particular night, D  came down to get L.S.C. and she begged him to take one of her sisters, which he did. *Id.* The Children said that D  "nutted on" their backs, that he would have them "suck his dick" and bribe them, or pay them with food, and that he would offer to pay them after sex. *Id.* One of the child victims disclosed that D  tried to rape her. *Id.* One of the child victims disclosed that Father walked in while she was being sexually abused by D  . *Id.*

On October 30, 2021, a criminal complaint charging multiple counts of felonious conduct against minor children, including, but not limited to, aggravated indecent assault, was filed against D  G  , at MJ-03210-CR-278-2021. D  G  y was arrested by the Bethlehem City Police Department, taken into custody, arraigned, and ordered to be held at

10

Northampton County Prison in lieu of $500,000 bail. On February 12, 2024, certified copies of Da. G_____y's criminal records were marked as Exhibit "Agency-4" and admitted into evidence. N.T. 2/12/24 Vol. I at p. 105. On November 2, 2021, a criminal complaint charging multiple counts of felonious conduct against minor children, including, but not limited to, terroristic threats and endangering the welfare of children and intimidation of a witness/victim, was filed against Mother at MJ-03210-CR-280-2021. Mother was arrested by the Bethlehem City Police Department, taken into custody, arraigned and ordered to be held at Northampton County Prison in lieu of $500,000 bail. Certified copies of Mother's criminal records were marked as Exhibit "Agency-5" and were admitted into evidence on February 12, 2024.

Also on November 2, 2021, a criminal complaint charging multiple counts of felonious conduct against minor children, including, but not limited to, endangering the welfare of children, was filed against Father at MJ-03210-CR-279-2021. Father was arrested by the Bethlehem City Police Department, taken into custody, arraigned and ordered to be held at Northampton County Prison in lieu of $500,000 bail. Certified copies of Father's criminal records were marked as Exhibit "Agency-6" and were admitted into evidence on February 12, 2024.

On November 8, 2021, the Agency filed thirteen Petitions for Adjudication of Dependency and Disposition Orders Requesting Removal, one for each of the Children. On November 12, 2021, all thirteen of the C_____ children were adjudicated dependent. On November 12, 2021, Hearing Officer Nancy Broadbent found clear and convincing evidence to substantiate the allegations of the thirteen Petitions for Adjudication and recommended, based on the findings of abuse, neglect and dependency, that it was in the best interests of all the Children to be adjudicated dependent, removed from the home of Mother and Father, and remain

11

in their foster care home placements. On November 15, 2021, the former Honorable Stephen G. Baratta of this Bench confirmed the adjudication of each of the thirteen Children.

On November 17, 2021, Mother's bail was reduced to $50,000. On November 19, 2021, Mother posted a $50,000 Surety bond and was released from jail. After making bail, Mother went to live with her father in Fountain Hill, Pennsylvania. On December 20, 2021, D٤ G____ bail was increased to $1 million. On December 22, 2021, Father's bail was reduced to $75,000.

The Agency conducted assessments and came to conclusions regarding the CPS referrals of sexual abuse as to each of the Children. Based upon the Children's disclosures and the perpetrator's admission, the Agency indicated on D٤ G٤ as well as both Mother and Father, for causing sexual abuse or exploitation of a child for each of the C٤ Children who were abused. On February 2, 2022, Mother posted a $100,000 surety bond to meet Father's bail. After Mother posted the surety bond, Father was released from jail and moved in with his mother and minor half-sibling at 9٤ Broadway, Bethlehem, PA 18015. Mother subsequently moved in with Father and his mother and minor half-sibling at the 9٤ Broadway residence.

For the first year following the Children's removal, no visitation was permitted by the Parents' bail conditions. On February 11, 2022, D٤ G٤ Mother, and Father each waived their respective rights to a Preliminary Hearing.

The following charges against D٤ G٤ were filed in the Northampton County Court of Common Pleas at docket numbers CP-48-CR-429-2022 and CP-48-CR-430-2022: two counts of aggravated assault on a person less than 13 years old, in violation of 18 Pa.C.S.A. § 3125 (A7); seven counts of indecent assault on a person less than 13 years old, in violation of 18 Pa.C.S.A. § 3126 (A7); nine counts of unlawful contact with a minor, in violation of 18

12

Pa.C.S.A. § 6318 (A1); seven counts of endangering welfare of children – Parent/Guardian/Other Commits Offenses, in violation of 18 Pa.C.S.A. § 4304 (A1); five counts of corruption of minors, in violation of 18 Pa.C.S.A. § 6301 (A2); and two counts of corruption of minors – defendant age 18 or above, in violation of 18 Pa.C.S.A. § 6301 (A18).

On November 30, 2022, D⸱ ⸱G⸱ entered into a guilty plea to seven counts of indecent assault on a person less than 13 years of age. On April 4, 2023 D⸱ ⸱ Jc⸱ ⸱ was sentenced to, *inter alia*, seven (7) to fourteen (14) years of confinement, followed by seven (7) years of probation and was adjudicated to be a sexually violent predator ineligible for Recidivism Risk Reduction Incentive.

Numerous counts of endangering the welfare of children, in violation of 18 Pa.C.S.A. § 4304 (a)(1), for sexual abuse and exposure to squalor and poor living conditions were filed against Father in the Northampton County Court of Common Pleas at CP-48-CR-434-2022. On November 1, 2022, Father pled guilty to a negotiated plea of endangering the welfare of children, and he received a sentence of, *inter alia*, three (3) to twelve (12) months confinement, with credit for time served. He was ordered to undergo mental health treatment, to take any prescribed medication, and to have no contact with the victims unless approved by the Agency.

The following charges against Mother were filed in the Northampton County Court of Common Pleas at CP-48-CR-428-2022: one count of terroristic threats, in violation of 18 Pa.C.S.A. § 2706 (a)(1), and numerous counts of endangering the welfare of children, in violation of 18 Pa.C.S.A. § 4304 (a)(I), for sexual abuse and exposure to squalor and poor living conditions.

On March 17, 2023, Mother entered a *nolo contendre* plea to the charge of intimidating a witness, as well as a guilty plea to endangering the welfare of children. For the charge of

13

intimidating a witness, Mother received a sentence of, *inter alia*, five (5) months, twenty-nine (29) days to eleven (11) months, twenty-eight (28) days confinement, with credit for time served, followed by two (2) years of probation. Mother was also ordered to undergo mental health treatment and to cooperate with CYS. For the charge of endangering the welfare of children, Mother received a sentence of, *inter alia*, three (3) months to twelve (12) months of confinement to run consecutively to the sentence on the intimidation charges.

On January 18, 2022, Dr. Alyssa Lindahl of PA Forensic Associates performed a Comprehensive Mental Health evaluation on Mother. N.T. 2/12/24 Vol. I at pp. 22-64. Dr. Lindahl testified at trial on February 12, 2024 via Zoom and telephone. Dr. Lindahl was qualified as an expert in forensic psychological evaluation. *Id.* at p. 28. Dr. Lindahl's C.V. was admitted into evidence as Exhibit "Agency-1."

Dr. Lindahl's Comprehensive Mental Health Evaluation report was dated January 28, 2022 and was admitted into evidence as Exhibit "Agency-2." At the January 18, 2022 Comprehensive Mental Health Evaluation, Mother reported to Dr. Lindahl, among other things, that: 1.) her daughters, S.C. and T.C. (who are not the subject of termination of parental rights herein), reported sexual abuse by D⎽⎽ ⎽⎽.) in July 2021, S.C. told her that D⎽ had also sexually abused her son, N.C.C.; 3.) cameras were installed the following day to monitor any such activity; 4.) she did not believe anything the girls were saying; and 5.) the girls' bedroom door had a lock on the outside to ensure that no one was going in there at night. *Id.* at pp. 22-64. Mother described her daughter, S.C., to Dr. Lindahl as being "vindictive" and "hypersexual", and told Dr. Lindahl that S.C. gave boys blow jobs in the school bathroom, that she sent naked photos of herself to male peers, and that she will do anything to "fuck you over." *Id.* at pp. 32-39.

14

Mother described S.C. and T.C. as being fixated on incest and stated that they regularly watched pornographic videos about incest. *Id.*

At the time when Mother made these statements about S.C. to Dr. Lindahl, S.C. was only fourteen (14) years old. *Id.* Therefore, Dr. Lindahl found these remarks to be of sufficient concern because such behaviors at that age are excessively sexual and would likely be referred for clinical intervention. *Id.* Mother described her daughter, T.C., to Dr. Lindahl as being "mean" and "a troublemaker." *Id.* Mother described another daughter, E.J.C. (who, as noted above, is the subject of a petition for termination of parental rights that was decided on October 11, 2024), to Dr. Lindahl as being a liar. *Id.* Mother described her daughter, L.S.C., to Dr. Lindahl as being "slow." *Id.* Mother described her daughter, J.C. (who is not the subject of termination of parental rights herein), to Dr. Lindahl as being "racist." *Id.* Dr. Lindahl testified that when Mother spoke to her about her daughters, Mother sounded agitated and angered, and she had nothing pleasant to say about them. *Id.*, and also pp. 47-48, 58. When Dr. Lindahl asked Mother on January 18, 2022 about whether she believed there had been sexual abuse by D    Mother stated that she did not believe anything the girls were saying. *Id.* at 42, 47-48, 58. Mother reported to Dr. Lindahl that she had been diagnosed with a hoarding disorder, which was brought on by losing seven children, at least one of which was stillborn, and losing her former home in a house fire. *Id.* at p. 39-42.

Mother reported to Dr. Lindahl that she hoarded baby items, which she did not believe she could ever completely recover from and that she was not motivated to do so. *Id.* Mother reported to Dr. Lindahl that she had been receiving individual therapy once a week and occasional family therapy through Life Guidance for five or six years. *Id.* Additionally, Mother was seeing a psychiatrist and taking medication for two or three years leading up to the January

15

18, 2022 evaluation. *Id.* pp. 39-42, 55. The fact that the baby items were kept in their own separate rooms was concerning to Dr. Lindahl; the clothing having its own separate bedroom when so many children of varying ages were sharing a single bedroom indicated to Dr. Lindahl, in her expert opinion, that the unused clothing and baby items were given precedence by Mother over her Children having more space. *Id.* Mother also reported to Dr. Lindahl that she had been diagnosed with PTSD, anxiety, and depression. *Id.* After testing and evaluation, Dr. Lindahl found those diagnoses to be accurate, and the personality testing Mother underwent as part of the evaluation by Dr. Lindahl suggested some schizoid personality traits with avoidant and paranoid features. *Id.* pp. 39-44, 55. Dr. Lindahl opined that Mother did not adequately protect her Children from sexual abuse after she was notified about same. *Id.* at pp. 43-47.

Dr. Lindahl also participated in the evaluations of S.C., T.C., J.C. and L.S.C. *Id.* at pp. 47-48. In evaluating those Children, Dr. Lindahl did not observe any of the behaviors that Mother had described, nor did she observe anything about the Children that would verify what their Mother had to say about them. *Id.* at pp. 56-58.

On March 10, 2022, Father underwent a court-ordered Comprehensive Mental Health Evaluation, which concluded and recommended, *inter alia*, the following: 1.) that Father be given a polygraph test to answer the question of whether he had engaged in inappropriate acts of sexual abuse against his Children; 2.) that Father would benefit from pharmacological treatment and individual interpersonal and/or cognitive psychotherapy; 3.) that due to the severity of his depression, Father would be a good candidate for electroconvulsive therapy; and 4.) that Father should undergo family therapy and protective parenting classes. *Id.* at pp. 123-127. The evaluation addendum recommended that Father not have any unsupervised contact with any of

16

his Children until he completed the protective-parenting program and was deemed appropriate by the Agency and his Children's treatment team. *Id.*

At the February 12, 2024 trial date, the parties stipulated that Father successfully completed the services requested of him by the Agency; however, Father did not follow through with the evaluator's recommendations that he undergo a polygraph examination and electric convulsive therapy. *Id.* Father did not comply with the polygraph recommendation, allegedly based upon his anxiety and the advice of his therapist. Similarly, Father did not comply with the recommendation for electroconvulsive therapy as his therapist allegedly deemed the treatment unnecessary. *Id.*

In July of 2022, Shakira Roseway, a Caseworker II within the Agency, became the assigned caseworker for the C₂    y family. N.T. 2/12/24 Vol. II at pp. 127-160. When the case was assigned to Ms. Roseway, she was informed that Father was residing in a home that was rented by his mother. *Id.* at p. 137. Ms. Roseway had the opportunity on two separate occasions to observe the inside of that home. *Id.*

Supervised visits with the Children began once a month while Ms. Roseway was involved with the case. *Id.* at pp. 131-136. Mother participated in a few of these visits before she was incarcerated. *Id.* Father continued attending the visits. *Id.* Ms. Roseway was present at most of the visits with the Children, which visits had to be supervised by four or five caseworkers. *Id.* Ms. Roseway described these visits as chaotic. The Children were running everywhere and needed to be frequently redirected during the visits. *Id.* At the visits, the caseworkers tried to encourage Father to take control and monitor the Children, but most of the time, the caseworkers needed to redirect the Children. *Id.* at pp. 131-136, 153-154. Ms. Roseway testified that never before in her experience had there been twelve children during a visit, with the need to have four

17

or five supervisors present for any given visit. *Id.* In addition to the larger visits, there were visits of subsets of the Children, which were supervised at Children's Home of Easton. These smaller group visits were an attempt to allow Mother and Father to interact more intimately with smaller groups of their Children. *Id.*

During the visits, the older Children would be drawn to Father, and Mother would hold the younger Children in her arms. While mother would make rounds and speak to the Children, the Children would have to vie for her individual attention. *Id.* Ms. Roseway testified that during the visits, the conversations between the Parents and the Children would occasionally become inappropriate and would need to be redirected. *Id.* at pp. 144-145. The inappropriate conversations included Mother's statements to the Children that they would be coming home, providing the Children with inaccurate dates on when they would be coming home, and telling the Children, "[w]e have a house." *Id.* at pp. 131-137, 144-145, 150-155.

The visit supervisors also reported that Mother and Father advised the Children that they did not need to listen to their foster parents and they could be disruptive in their foster homes. *Id.* After Mother was incarcerated, Mother would be on the phone during the visits. *Id.* Ms. Roseway testified that Father timely came to all the visits; however, he did not show emotion. *Id.* at p. 150-152.

Ms. Roseway testified that Father had limited engagement with the Children during the visits, primarily with the younger children. *Id.* Ms. Roseway testified that when the Children's visits with Mother and Father concluded, the Children were upset to learn they needed to leave each other. *Id.* at pp. 150-158. Although they would give Father a hug, their emotion was geared towards each other. *Id.* Some of the Children's behavioral issues increased after the visits. *Id.*

18

Ms. Roseway testified that at one of the first visits attended by E.J.C., L.S.C. and I.A.C., she witnessed E.J.C. going through Mother's phone when she came upon a picture of D— and asked Mother why that picture was still there. *Id.* at p. 141. Mother responded, "[b]ecause he is my son." E.J.C. replied, "[n]ot a good son," and Mother's response was, "[a]ll of you are not good sometimes, should I take you out too? Should I ignore you?" *Id.* Ms. Roseway testified that E.J.C., who is outgoing and will go to whomever is willing to give her attention during the visits, would try to get the attention of Mother and Father and talk to them. *Id.* at pp. 135-136. Ms. Roseway testified that, at times, E.J.C. would tell Mother and Father that she wants to be in care, and Mother and Father would respond that she needs to be with family. *Id.* at pp. 146-147.

While in prison, Mother completed a program that allowed her to have visits with the Children at the prison. *Id.* at p. 130-134. In summer of 2023, the Agency began to initiate visits involving Mother at the Northampton County Prison. *Id.* at pp. 180-185. However, only five of the Children could be brought to these visits due to the small size of the rooms being unable to accommodate all of the Children. *Id.* The prison visits with Mother led to enhanced behavioral concerns of the Children, such as disrespect in the foster homes and uncontrollable crying by the younger Children. *Id.* Mother would tell the Children she was going to be getting out of jail and that the family would be together again. *Id.*

The parties did not receive, because they were not in a position to receive, unsupervised visits from the time that the Children were placed until the time of trial. *Id.* at p. 156. As of the time of trial, there was no realistic expectation of housing or of unsupervised visits even though the parents had completed some of the services that the Agency had required of them. *Id.* at p. 157.

On October 18, 2023, Ms. Lorah was assigned to supervise this case. As part of Ms. Lorah's involvement, she went with Ms. Roseway to the address at 9° Broadway in Bethlehem, PA. *Id.* at pp. 185-186. At that time, she had a conversation with Father and his mother about what would need to happen in order to have the Children reside there. *Id.* at pp. 162-163. On November 28, 2023, Mother was released from prison and moved into the 9° Broadway home, where she resided while serving a two (2) year period of probation. Since Mother's release from prison, Mother and Father's visits were together and always supervised. *Id.* at pp. 174-176, 179-184. Ms. Lorah testified that she observed similar issues during the visits as Ms. Roseway observed. *Id.* Specifically, Mother was reportedly informing the Children about when she was being released from prison, and the Children would act out more around the time of the visits. *Id.*

Ms. Lorah testified that during the visitations, Mother spent a lot of time with the younger Children, and, while Father interacted with the Children, it was difficult for him to give them individualized attention due to the number of Children. *Id.* The sibling visits, even with four or five supervisors, tended to be out of control. *Id.* Ms. Lorah stated that the Children acted out to get attention from their Parents. *Id.* Ms. Lorah testified that in March 2024, Mother and Father canceled one of their visits with the Children because they missed the bus, and although Mother and Father were informed that they could take a later bus and still attend the visit, Father declined, saying he had already taken his shoes off and was home for the night. *Id.* Mother testified that she never heard Father say he was not going to a visit because he had already taken his shoes off. *Id.*

As of the time of trial, Z.K.-E.C. (not the subject of the instant appeal) and N.C.C. were still together in the same foster home. Ms. Lorah testified that N.C.C. was very vocal about his

20

wish to be adopted and remain in the home where he was. *Id.* at p. 172-173. L.S.C. was placed in foster care with I.A.C. They were doing well and they wished to be adopted into the home that they were in. *Id.* H.S.C., V.C.C. and K.O.C. were placed in foster care together, were doing well and were in a home that was an adoptive resource for them. *Id.*

At the time of the nonjury trial, Mother and Father resided at 9( ' Broadway, Bethlehem, PA 18015 which was rented by Father's mother. N.T. 2/12/24 Vol II at pp. 180-187. Father's mother and Father's younger brother, who is approximately thirteen (13) years old, also lived at the 9. ' Broadway residence. *Id.* Mother and Father never presented the Agency with a copy of lease for the 9b ' Broadway residence. N.T. 2/12/24 Vol. II at p. 188-189. The Agency inspected the 9 ' Broadway residence in the summer and fall of 2023. N.T. 2/12/24 Vol. II at p. 185. The Agency repeatedly notified the Parents that a copy of the lease and/or a letter from the landlord indicating who was permitted to be living at that residence was necessary as a standard requirement. *Id.* at pp. 180-187. Ms. Lorah testified that she could not pursue the option of having visitations take place at the 9( ⁄ Broadway residence because the Agency never received anything from the landlord about who was permitted to reside in the home. *Id.* Ms. Lorah further testified that if there was no potential for the Children to move to that residence, having visitations there would give the Children false expectations. *Id.* at pp. 180-187, 206.

At the time of the February 12, 2024 trial, Mother and Father's plan for reunification was to house the Children at the 9( ⁄ Broadway residence. Mother may not be eligible to obtain Section VIII housing assistance because the prior Section VIII residence in which she had lived was condemned and because Mother and Father were incarcerated for felonies. N.T. 2/12/24 Vol. II at p. 188.

21

The home at 9   Broadway is two floors, with 3 bedrooms on the second floor, plus an attic. It has one full bath and a powder room. The attic has an open area and a small room the size of a walk-in closet, which has an open doorway and no window. Ms. Lorah testified that the Parents would have had to have cleaned out rooms and obtained furniture were the Children to live there. *Id.* at pp. 180-187. Mother reported that she was looking for housing outside of the area in other counties. *Id.*

Because the landlord's permission regarding how many individuals are permitted to live at the 9   Broadway residence was never obtained, the Agency never contacted the City of Bethlehem to confirm that the property would allow occupancy of the Ce  y family at that address. N.T. 2/12/24 Vol. II at p. 205. Because neither Mother nor Father is a homeowner and/or leaseholder of the 9(  Broadway residence and could potentially be evicted at any time, the home is not considered stable housing.

Mother and Father completed protective parenting education and were compliant with court-ordered services; however, at the time of trial, neither Parent was in a position to have unsupervised visits with the Children, and they had no realistic expectation of housing available to them. None of the children's therapists or service providers recommended reunification. N.T. 2/12/24 Vol. II at p. 212.

At the time of the February 12, 2024 trial, Mother and Father did not work and were not receiving SSD or SSI benefits. Mother was appealing her denial of SSD benefits. Mother had applied for Section 8 housing in several surrounding counties to no avail. *Id.* at 232-233. Mother applied for Section VIII housing in Northampton, Lehigh, Carbon, and Schuylkill Counties. *Id.* at pp. 190-204. Those applications remained pending. *Id.* Mother had been working with Lehigh Valley Families together on trying to find housing and is on several wait lists. *Id.* Mother

22

and Father did not have a car and use public transportation. *Id.; see also* pp. 137-141. The Agency had been providing them with bus passes. *Id.*

Mother testified that she had no bills because she is living with family and she did chores for the household. N.T. 2/12/24 Vol II at pp. 230-232. However, Mother admitted that she owes criminal costs and fees, and she testified that her hoarded baby items are in storage units that she is still cleaning out. Mother had not been employed since she was seventeen (17) years old. *Id.*

Mother testified that when she had the Children, she was able to support herself by receiving cash assistance. She testified that if the Children were returned to her, she would attempt to get them furniture and beds from a charity and/or family. *Id.* at p. 234. Mother testified that she has OCD, a hoarding condition, anxiety, depression, irritable bowel syndrome, and an issue where she cannot be around many people. *Id.* at p. 227.

At the time of the February 12, 2024 trial, Father supported himself by selling plasma for which he receives $45-$60 per occasion; he can sell it five to six times per month. N.T. 2/12/24 Vol I. at p. 231. As of the February 12, 2024 trial, other than the money Father received from selling his plasma, neither Mother nor Father had any income. *Id.* Mother testified that she was unable to work. Mother testified that while she wants to re-enter the workforce, right now, she must worry about herself, get counseling, and get herself together. *Id.* at p. 227.

Mother testified regarding her hoarding of baby items. She explained that she began hoarding baby items about ten (10) years ago, after having had seven (7) miscarriages, as well as a house fire in which she lost everything. Mother had two "hoarding rooms" at the 7 Broadway address. N.T. 2/14/24 Vol II at p. 239-240. One of these was in the attic space that adjoined D____'s room, and the other was in the front room downstairs. *Id.* Mother described

23

the two hoarding rooms as extra rooms, not bedrooms, and stated that she was not going to put any Children upstairs in the space next to Da_ _'s room due to the sexual abuse allegations against D_ _, and she was not going to put any Children in the front room on the ground floor where they could leave the house. *Id.*

Mother testified she believed that the Children were out of control and acting badly because the Children are in foster care. *Id.* at p. 250-257. Mother testified she believed that the Agency should return her Children little by little until she is capable of taking care of them all at once. *Id.* at pp. 236-237, 250.

At the time of the February 12, 2024 trial, Father had no income except for selling his plasma. When Father has money, he contributes to the 9_ _ Broadway household; however, he usually he contributes by doing chores in the household. It is unclear whether Father's mother is living at the 9_ Broadway residence using a Section VIII housing voucher.

On February 12, 2024, Father acknowledged that he could not support Mother or any of his Children until he had a job. After the youngest six (6) Children were removed from the care of Mother and Father on February 12, 2024, the Agency filed a Complaint for Support against Father. The Pennsylvania Department of Human Services confirmed that Father had no income or assets available to pay support for his Children. N.T. 2/12/24 Vol II at pp. 190-192. Father's documents with Domestic Relations were marked Exhibit "Agency-16" and admitted into evidence.

Finally, the Guardian ad Litem provided his position on record regarding the Petitions for Involuntary Termination of Parental Rights. The Guardian ad Litem stated at trial, "[I] am in

24

favor of the termination on behalf of all six children who are in front of the Court today." N.T. 2/12/24 Vol II at p. 266.[5]

## Discussion

### I. Statutory Grounds for Involuntary Termination of Parental Rights

"The statute permitting the termination of parental rights outlines certain irreducible minimum requirements of care that parents must provide for their children, and a parent who cannot or will not meet the requirements within a reasonable time following intervention by the state, may properly be considered unfit and may properly have his or her rights terminated." *In re B.L.L.*, 787 A.2d 1007, 1014 (Pa. Super. 2001). In order to terminate the rights of a parent in regard to a child, a petitioner must demonstrate one or more of the nine grounds set forth in section 2511(a) of the Adoption Act. *See* 23 Pa.C.S.A. § 2511(a). Here, CYS sought to terminate Mother's parental rights based on subsections 2511(a)(1), (a)(2), (a)(5), (a)(8), and (a)(10) and (b) of the Adoption Act. The relevant subsections are set forth below:

Section 2511. Grounds for involuntary termination

(a) General rule.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

. . .

---

[5] The original transcripts contained a transcription error on page 266 wherein the original transcript inadvertently identified the Court as speaking on lines four (4) through eight (8) when in fact it was the Guardian ad Litem, Lenard Mellon, Esq. speaking. Upon discovering this error, this Court had the error corrected and filed an Order on October 21, 2024 having the corrected transcripts sent to the Superior Court. See attached Exhibit A.

25

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

. . .

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

. . .

(10) The parent has been found by a court of competent jurisdiction to have committed sexual abuse against the child or another child of the parent based on a judicial adjudication as set forth in paragraph (1)(i), (ii), (iii) or (iv) or (4) of the definition of "founded report" in section 6303(a) (relating to definitions) where the judicial adjudication is based on a finding of "sexual abuse or exploitation" as defined in section 6303(a).

23 Pa.C.S.A. § 2511(a).

## II. Burden of Proof

The grounds for termination must be established by clear and convincing evidence. *See Santosky v. Kramer*, 455 U.S. 745, 746 (U.S. 1982); *In re T.D.*, 949 A.2d 910, 914 (Pa. Super. 2008). This standard requires evidence "that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re Adoption of Atencio*, 650 A.2d 1064, 1066 (Pa. 1994). The burden of proof is high because Pennsylvania law recognizes that the family unit is an important one, and the bonds of family should not be lightly or easily severed. *In re William L.*, 383 A.2d 1228, 1234

26

(Pa. 1978). Nevertheless, Pennsylvania law also recognizes that the rights of parenthood are accompanied by responsibilities. *In re Adoption of J.J.*, 515 A.2d 883 (Pa. 1986).

### III. Consideration of the Needs and Welfare of the Child

If the Court finds that a petitioner has carried its burden of proving that a parent's conduct warrants termination of parental rights based on one or more of the grounds specified in section 2511(a), the Court must then consider whether termination would serve the needs and welfare of the child. *See* 23 Pa.C.S.A. § 2511(b).

> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

*Id.*; *accord In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007). The Court in *In re L.M.* stated:

> [U]nder Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [23 Pa.C.S.A. §] 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to [23 Pa.C.S.A. §] 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d at 511 (internal citations omitted).

Pursuant to the authorities cited above, the Court must determine, for each parent, whether CYS has carried its burden of proving, by clear and convincing evidence, that (1) the parent's conduct warrants termination of parental rights based on one or more of the grounds set

forth in section 2511(a); and (2) termination of parental rights would serve the needs and welfare of the Children. We will analyze each factor.

## IV. Section 2511(a)(1)

The ground set forth in Section 2511(a)(1) is as follows:

> The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

23 Pa.C.S.A. § 2511(a)(1). Section 2511(a)(1) codifies historical case law that permitted termination of parental rights based on a theory of abandonment. *See In re Adoption of S.P.*, 47 A.3d 817, 827-28 (Pa. 2012). A court may terminate parental rights under Section 2511(a)(1) where the parent demonstrates a settled purpose to relinquish parental claim to a child or fails to perform parental duties for at least the six months prior to the filing of the termination petition. *See In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2010). "Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances." *In re B., N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004). As quoted by the Superior Court in *In re B., N.M.*:

> A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs. Although it is the six months immediately preceding the filing of the petition that is most critical to the analysis, the trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision.

*Id.*

Here, prior to the Child being taken into custody by CYS, Mother and Father obtained

28

criminal charges related to their inability to protect their Children, including the subject child, from repeated sexual abuse despite knowledge of same. During the time the Children, including the subject child, were residing with Mother and Father, they were not only being sexually abused, but they were also living in overcrowded, unsanitary, and unsafe conditions of absolute squalor as stated in detail herein. At the time that the Children were removed from Mother and Father's care in 2021, Mother and Father were unable to adequately feed, house and nurture the Children; they were unable to financially provide for the Children; and they were not able to transport the Children as needed, which led, among other things, to instances of medical and dental neglect.

Thus, we find that Mother evidenced a settled purpose of relinquishing her parental claims to the Child and has refused or failed to perform parental duties. Accordingly, the Court holds that CYS has carried its burden of proof by clear and convincing evidence for termination of parental rights under Section 2511(a)(1) with respect to Mother.

## V. Section 2511(a)(2)

The ground set forth in Section 2511(a)(2) is as follows:

> The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S.A. § 2511(a)(2). "[Under] section 2511(a)(2), . . . the petitioner for involuntary termination must prove (1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In re Int. of Lilley*, 719 A.2d 327, 330 (Pa. Super. 1998). "Unlike

29

subsection (a)(1), subsection (a)(2) does not emphasize a parent's refusal or failure to perform parental duties, but instead emphasizes the child's present and future need for essential parental care, control or subsistence necessary for his physical or mental well-being." *In re E.A.P.*, 944 A.2d 79, 82 (Pa. Super. 2008). "Thus, while 'sincere efforts to perform parental duties,' can preserve parental rights under subsection (a)(1), those same efforts may be insufficient to remedy parental incapacity under subsection (a)(2)." *In re Z.P.*, 994 A.2d at 1117. The question is not whether the parent will ever overcome the circumstances that led to the original placement but whether he or she will do so within sufficient time to provide meaningful permanency for the child. *See In re Z.P.*, 994 A.2d 1108, 1125 (Pa. Super. 2010).

Here, while Mother and Father have participated in court-ordered services and attended visits consistently throughout the dependency, Mother and Father remained unstable with respect to housing and income. Additionally, during the dependency period, they were never able to have unsupervised visits with the Children, and visits were continuously chaotic, with the Children acting out and/or seeking attention from Mother and Father.

We find that Mother's unstable living conditions, as well as Mother's unstable behaviors related to, *inter alia*, her hoarding issue, constitute "incapacity, abuse, neglect or refusal of the parent" that left the Children without "essential parental care, control or subsistence necessary for her physical or mental well-being." In addition, we find that Mother's conduct since the Children's placement demonstrated that "the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent."

As previously discussed in our factual history, since the Child's placement, Mother and Father have demonstrated a lack of commitment to the steps necessary to permit them to regain custody of the Child, especially pertaining to housing. No lease or permission from the landlord

30

of the home in which Mother and Father had been residing was ever provided. Before Mother and Father could begin attempting to reunite with the Child, they would have needed to establish a suitable home. Further, at the time of the February 12, 2024 non-jury trial, Mother had no employment. Mother and Father failed to have clothing and furniture in their current residence that would be sufficient for the Child, and we heard testimony that that residence was cluttered and dirty.

The foregoing, including, *inter alia*, Mother's past behaviors and insufficient housing, support the finding that Mother was unlikely to remedy the "incapacity, abuse, neglect or refusal" that have left the Child without "essential parental care, control or subsistence necessary for her physical or mental well-being." Thus, the Court finds that CYS has carried its burden of proof by clear and convincing evidence for termination of parental rights under Section 2511(a)(2) with respect to Mother.

## VI. Section 2511(a)(5)

The ground set forth in Section 2511(a)(5) is as follows:

The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

23 Pa.C.S.A. § 2511(a)(5).

Here, well over six months have elapsed since the removal or placement. This Court consistently found that the conditions that led to the removal or placement continued to exist and that Mother failed to make meaningful progress in alleviating the circumstances that had led to the removal or placement. Additionally, the Guardian ad Litem's position at trial was in favor of

31

the termination of parental rights. Based on the testimony at the trial, the position of the Guardian ad Litem and all the reasons stated *supra*, we find that that the conditions that led to the removal or placement continue to exist at this time.

For the reasons discussed, we find that Mother did not and would not remedy those conditions within a reasonable period of time and that the services or assistance available to her were not likely to remedy those conditions within a reasonable period of time. Accordingly, CYS has carried its burden of proof by clear and convincing evidence for termination of parental rights under Section 2511(a)(5) with respect to both Mother.

## VII. Section 2511(a)(8)

The ground set forth is Section 2511(a)(8) is as follows:

> The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S.A. § 2511(a)(8). "Section 2511(a)(8) sets a 12–month time frame for a parent to remedy the conditions that led to the children's removal by the court." *In re A.R.*, 837 A.2d 560, 564 (Pa. Super. 2003). "Once the 12–month period has been established, the court must next determine whether the conditions that led to the child's removal continue to exist, despite the reasonable good faith efforts of the Agency supplied over a realistic time period." *In re Z.P.*, 994 A.2d at 1118. "Termination under Section 2511(a)(8) does not require the court to evaluate a parent's current willingness or ability to remedy the conditions that initially caused placement or the availability or efficacy of Agency services." *Id.*

> We recognize that the application of Section (a)(8) may seem harsh when the parent has begun to make progress toward resolving the problems that had led to removal of her children. By allowing for termination when the conditions that led to removal of the child continue to exist after a year, the statute implicitly recognizes that a child's life cannot be held in abeyance while the parent is unable to perform the

32

actions necessary to assume parenting responsibilities. This Court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future. Indeed, we work under statutory and case law that contemplates only a short period of time, to wit eighteen (18) months, in which to *complete* the process of either reunification or adoption for a child who has been placed in foster care.

*In re C.L.G.*, 956 A.2d at 1005 (emphasis in original) (citation omitted).

Here, more than twelve months elapsed since the removal or placement. The conditions that led to the removal or placement continued to exist and Mother failed to make meaningful progress in alleviating the circumstances that had led to the removal or placement. Additionally, the Guardian ad Litem's position at trial was in favor of the termination of parental rights. Based on the testimony at the trial, the position of the Guardian ad Litem and for all the reasons discussed above, we find that that the conditions that led to the removal or placement continued to exist. Accordingly, CYS carried its burden of proof by clear and convincing evidence for termination of parental rights under Section 2511(a)(8) with respect to both Mother.

## VIV. Needs and Welfare of the Child

Where, as here, the Court finds that CYS has established that the Parents' conduct warrants termination of parental rights based on one or more of the grounds set forth in section 2511(a), the Court must then consider whether termination of parental rights would serve the needs and welfare of the child. *See* 23 Pa.C.S.A. § 2511(b). "The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." *Id.* "One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond." *In re L.M.*, 923 A.2d at 511.

> When conducting a bonding analysis, the Court is not required to use expert testimony...Social workers and caseworkers can offer evaluations as well... Additionally, Section 2511(b) does not require a formal bonding

33

evaluation... "Above all else ... adequate consideration must be given to the needs and welfare of the child."... A parent's own feelings of love and affection for a child, alone, do not prevent termination of parental rights.

Before granting a petition to terminate parental rights, it is imperative that a trial court carefully consider the intangible dimension of the needs and welfare of a child—the love, comfort, security, and closeness—entailed in a parent-child relationship, as well as the tangible dimension. Continuity of relationships is also important to a child, for whom severance of close parental ties is usually extremely painful. The trial court, in considering what situation would best serve the child[ren]'s needs" and welfare, must examine the status of the natural parental bond to consider whether terminating the natural parents' rights would destroy something in existence that is necessary and beneficial.

*In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010) (internal citations omitted).

Here, the developmental, physical, and emotional needs and welfare of the Child would not be met with Mother. It was in the Child's best interest that parental rights of Mother be terminated. The Child had been exposed to traumatic events involving sexual abuse and living in squalor while in Mother's care. Mother was not in any position to effectively address the Child's needs given the trauma inflicted. Mother, in particular, had clearly shown an inability to successfully address her own issues. This Court did not see a way in which Mother could effectively address the needs or attention the Child requires. Additionally, the Guardian ad Litem's position at trial was in favor of the termination of parental rights.

As to the relationship between Mother and the Child, this Court is concerned about "the nature, and status of the emotional bond between parent and child." *In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007). Mother has failed to recognize her co-dependency issues and she has failed to form healthy relationships with the Children. Mother has failed to set appropriate boundaries with the Children, particularly evident in the inappropriate conversations she had with the Children during visits concerning future plans, which raised the Children's hopes of when and where they would reside together long term. We heard testimony that Mother would

34

attempt to guilt the Children by telling them that they needed to be with family. Any bond between Mother and the Child is not one that is so great such that it would justify denial of the Agency's Petition for termination of parental rights.

The record is clear that Mother is not a position to even have unsupervised contact with the Child at this point. For much of the Child's life and continuing into the present, Mother's continued incapacity and the Child's exposure to abuse and neglect have caused the Child to be without parental control or subsistence required for the Child's well-being. Mother's rationalizations for much of her behavior is problematic. Mother has not satisfied her affirmative obligation to act in the Child's best interests. This Court finds that the conditions and causes of incapacity, abuse, neglect, and refusal have not and will not be remedied. The developmental, physical, and emotional-needs and welfare of the Child will not be met by Mother given her ongoing extensive personal issues, including, but not limited to, financial and housing issues. Thus, the Court finds that CYS has carried its burden of proving that termination of Mother's parental rights would serve the Child's needs and welfare.

## CONCLUSION

Based on the foregoing, this Court determined CYS established grounds for terminating the parental rights of Mother and Father under 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8) and that termination of Mother's rights served the needs and welfare of the Child as required by 23 Pa.C.S.A. § 2511(b). It was proper to grant CYS's petition for involuntary termination of parental rights and for a goal change from "return to parent" to "adoption."

BY THE COURT:

_Jennifer Sletvold_

JENNIFER R. SLETVOLD, J.

35

# EXHIBIT A

COURT OF COMMON PLEAS OF NORTHAMPTON COUNTY
COMMONWEALTH OF PENNSYLVANIA
ORPHANS' COURT DIVISION

IN RE: KOC, VCC, HSC,    : OC-2023-0044
IAC, LSC, EJC, MC, ZC,    : OC-2023-0045
                      : OC-2023-0046
                      : OC-2023-0047
                      : OC-2023-0048
                      : OC-2023-0049
                      : OC-2024-0002
                      : OC-2024-0003

FILED OC
2024 OCT 21 PM 2:4?
REGISTER OF WILLS &
CLERK OF ORPHANS COURT
NORTHAMPTON COUNTY

## ORDER OF COURT

**AND NOW**, THIS 18th day of October, 2024, the Court having noticed an error in the transcript, and that error having been corrected, it is **ORDERED** that the notes of testimony of February 12, 2024, volume II, shall be filed of record and sent to the Superior Court forthwith. We note that the error on the transcript was on page 266 whereas the original transcript inadvertently identified the Court as speaking on lines four through eight when in fact it was the Guardian ad Litem, Lenard Mellon, Esquire. The amended volume II accurately reflects the testimony of record.

BY THE COURT:

_Jennifer Sletvold_

JENNIFER R. SLETVOLD, Judge